**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
FELICIA ANNETTE FORREST,

                    *Plaintiff*,

                -against-

COMMISSIONER OF THE SOCIAL SECURITY
ADMINISTRATION,

                    *Defendant*.
------------------------------------------------------------X

                          **MEMORANDUM**
                             **AND**
                           **ORDER**
                    23-cv-00307 (JMW)

**A P P E A R A N C E S**:

      Howard D. Olinsky, Esq.
      **Olinsky Law Group**
      250 South Clinton Street, Suite 210
      Syracuse, NY 13202
      *Attorney for Plaintiff*

      Social Security Administration
      **Office of the General Counsel**
      c/o Office of Legal Operations/Blake Pryor
      6401 Security Boulevard
      Altmeyer Building, Room 617
      Woodlawn, MD 21235

                *-and-*

      Hugh Dun Rappaport, Esq.
      Sergei Aden, Esq.
      Special Assistant U.S. Attorney, DOJ
      **Office of the General Counsel**
      6401 Security Boulevard
      Baltimore, MD 21235
      *Attorneys for Defendant*

**WICKS**, Magistrate Judge:

Plaintiff Felicia Annette Forrest ("Plaintiff" or "Forrest") seeks review and reversal of the final decision by the Commissioner of Social Security ("Commissioner" or "Defendant"), reached after a hearing before an administrative law judge ("ALJ"), the result of which denied his application for a period of disability and disability insurance benefits ("DIB") benefits under Title II of the Social Security Act (the "Act") (hereafter, the "ALJ's Decision"). Now before the Court is: (i) Plaintiff's Motion for Judgment on the Pleadings (ECF No. 15); and (ii) Defendant's Cross Motion for Judgment on the Pleadings, seeking an affirmation of the ALJ's Decision. (*See* ECF No. 15-2.) For the reasons stated herein, Plaintiff's Motion (ECF No. 15) is **DENIED**, the Commissioner's Cross Motion (ECF No. 15-2) is **GRANTED**, and ALJ's Decision is **AFFIRMED**, consistent with this Order.

## BACKGROUND

### I.    *Factual Background*

The following facts are taken directly from the parties' Joint Stipulation of Facts at ECF No. 15-3. On February 20, 2020, Plaintiff filed applications for Title II Disability Insurance Benefits and Title XVI Supplemental Security Income, alleging disability beginning September 15, 2019, due to an ankle problem and knee pain. (ECF No. 15-3 at ¶ 1.) The Agency denied her claims initially on June 5, 202 and on reconsideration on May 17, 2021. (*Id*.) After a hearing held on November 10, 2021, ALJ David Tobias issued an unfavorable decision dated December 8, 2021. (*Id*.)

In his decision, the ALJ found that Plaintiff meets the insured status requirements through December 31, 2024, and has not engaged in substantial gainful activity since the alleged onset date of September 15, 2019. (*Id*. at ¶ 2.) The ALJ found that Plaintiff has the following severe

2

impairments: status post left ankle fracture with residual impairment and left foot/ankle complex regional pain syndrome, obesity, hypertension, sleep apnea, major depressive disorder, and anxiety disorder. (*Id*.) He determined that no combination of Plaintiff's impairments met or equaled a listed impairment. (*Id*.) The ALJ determined that Plaintiff had the residual function ("RFC") to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except:

> claimant can occasionally climb stair/ramps, balance, stoop, crouch, kneel, and crawl, and cannot climb ladders/ropes/scaffolds or be exposed to unprotected heights or dangerous machinery or have concentrated exposure to cold temperature extremes or vibration. Claimant is also limited to performing simple tasks.

(*Id*.)

The ALJ found that Plaintiff was unable to perform her past relevant work but could perform other work that exist in significant numbers in the national economy, including the representative occupations order clerk, charge account clerk, and assembler. (*Id*.) On November 21, 2022, the Appeals Council denied review making the ALJ's decision the final Agency decision. (*Id*.)

Plaintiff was 46 years old at the time of application. (*Id*. at ¶ 3.) She completed the twelfth grade and endorsed past employment as a "scrub tech" from July 2002. (*Id*.) She reported that her job involved standing or walking "All day." (*Id*.) After stopping work in September 2019 after injuring her left ankle while on a cruise, Plaintiff received short-term disability and collected unemployment insurance benefits in the 2nd, 3rd, and 4th quarters of 2020, and the 1st and 2nd quarters of 2021. (*Id*.) On September 23, 2019, Plaintiff presented at Branch Orthopedics with a chief complaint of left ankle pain. (*Id*. at ¶ 4.) She reported that one week prior she had slipped on water, while on a cruise, and twisted her ankle. (*Id*.) She further reported that she had been using a small brace since said slip but recent imaging at the emergency department had revealed a fracture. (*Id*.) Plaintiff presented in a splint for further evaluation. (*Id*.)

On October 3, 2019, Plaintiff presented for an open reduction and internal fixation ("ORIF") of the left ankle fracture performed by Chris Moros, D.O. (*Id*. at ¶ 5.) Plaintiffs preoperative and postoperative diagnosis was left ankle bimalleolar equivalent ankle fracture. (*Id*.) On November 1, 2019, Plaintiff returned to Branch Orthopedics. (*Id*. at ¶ 6.) She reported improving symptoms. (*Id*.) She had no acute complaints. (*Id*.) Her mood and affect were appropriate. (*Id*.) After removal of the cast, a left ankle examination showed a healed incision, diffuse tenderness, and mild swelling. (*Id*.) Plaintiff's neurovascular examination was normal. (*Id*.) X-rays taken that day and on October 11 revealed status post ORIF with hardware in proper positioning with signs of healing. (*Id*.) Branch Orthopedics transitioned Plaintiff from a cast to a Controlled Ankle Movement ("CAM") walker and recommended starting physical therapy. (*Id*.)

Physical therapy commenced on November 6, 2019. (*Id*. at ¶ 7.) She reported not being able to walk or stand on her left ankle. (*Id*.) The pain was worsened by lying down and standing, but not sitting. (*Id*.) On November 22, 2019, Plaintiff presented at Branch Orthopedics with a chief complaint of left ankle pain. (*Id*. at ¶ 8.) She reported "slowly improving symptoms." (*Id*.) Plaintiff was noted to use a CAM walker and crutches. (*Id*.) Physical examination revealed tenderness and limited range of motion. (*Id*.) Plaintiff was assessed with status post left ankle ORIF- healed per x-ray imaging. (*Id*.) Plaintiff was advised to transition to weightbearing as tolerated, first in the CAM walker and then without it. (*Id*.)

On February 2, 2020, Plaintiff presented for physical therapy performed by Gregory Beach, PT with a diagnosis of displaced fracture of lateral malleolus of left fibula with routine healing. (*Id*. at ¶ 9.) She reported that her ankle was feeling a lot better with less pain and much looser that day. (*Id*.) On February 11, Plaintiff told the physical therapist that her pain and strength was improving; there was some persistent stiffness in her ankle. (*Id*.) On February 28,

4

she said she had less pain. (*Id.*) Physical examination on March 4, revealed edema of the left foot and ankle which was treated with extensive retrograde massage. (*Id.*) Plaintiff was noted to only be partial weight bearing on the left lower extremity and to use ambulation aides including axillary crutches and CAM boot. (*Id.*) Plaintiff reported her ankle felt good over the weekend, with minimal symptoms. (*Id.*) She rated her general health as "Very good." (*Id.*)

On March 11, 2020, Plaintiff told the physician's assistant at Branch Orthopedics that her symptoms were improving with physical therapy. (*Id.* at ¶ 10.)  She had no acute complaints but continued to walk with an improved although altered gait. (*Id.*) Her mood and affect were appropriate. (*Id.*) An examination showed mild swelling and some tenderness and limited range of motion, and otherwise that Plaintiff was neurovascularly intact and had no gross instability. (*Id.*) Diagnosis revealed routine healing status of the left ankle ORIF. (*Id.*) In the next few physical therapy sessions, Plaintiff also reported "slow and steady progress of increased strength and improved ability to walk without limping." (*Id.* at ¶ 11.)  As of March 11, she reported "overall feeling better with improved gait and decreased tightness in her calf. She still has issues with ankle flexibility to squat down to the floor and walk without a slight limp and unable to run due to pain and restrictions in her ankle." (*Id.*)

In a functional assessment, Plaintiff reported being able to walk without significant pain for 10 to 15 minutes, being unable to lift medium weight, and being able to stand for up to 45 minutes without aggravating pain and up to 30 minutes without increased symptoms. (*Id.*) In a functional scale questionnaire, Plaintiff reported, *inter alia,* extreme difficulty with running and hopping, a little bit of difficulty with walking two blocks or a mile or standing for an hour, and no difficulty in walking between rooms, sitting for an hour, squatting, lifting any objects off the

floor, performing light or heavy activities around the home, getting into or out of a car, or going up 10 or a flight of stairs. (*Id*.)

On June 5, 2020, State agency medical consultant Dr. Nancy Ceaser assessed that, within 12 months of Plaintiffs alleged onset date (September 15, 2019), she would be capable of work that involved lifting and carrying up to 20 pounds occasionally and 10 pounds frequently, commensurate pushing and pulling, standing or walking for a total of two hours with normal breaks, and sitting for a total of about six hours in an eight-hour workday with normal breaks. (*Id*. at ¶ 12.)  Plaintiff would also be limited to never climbing ladders, ropes, or scaffolds; occasionally kneeling, crouching, and climbing ramps and stairs; and frequently balancing, stooping, or crawling. (*Id*.) She would need to avoid concentrated exposure to extreme cold, vibration, or hazards. (*Id*.) Among other evidence, Dr. Ceaser noted that Plaintiff sustained a left ankle fracture and underwent surgical correction. (*Id*.) As of March 2020, she continued to improve. (*Id*.)

An examination showed mild swelling and some tenderness and limited range of motion, and otherwise that Plaintiff was neurovascularly intact and had no gross instability. (*Id*.) In a recent physical therapy note, despite pain in the lateral ankle, Plaintiff was reported to be in good health and showed steady progress, increased strength, and increased ability to walk without limping. (*Id*.) Dr. Ceaser noted that Plaintiff also mentioned a knee problem, but there was no evidence to establish any knee impairment. (*Id*.) Dr. Ceaser thus concluded that, within 12 months of her alleged onset date, Plaintiff would be capable of the above work functions. (*Id*.) On June 5, 2020, Plaintiff presented to a physician's assistant at Branch Orthopedics with a chief complaint of left ankle pain. (*Id*. at ¶ 13.)  Plaintiff reported continued pain and swelling with activities. (*Id*.) Mental status examination revealed that her mood and affect were appropriate.

(*Id*.) A left ankle examination showed mild swelling, tenderness, limited range of motion, and that Plaintiff was neurovascularly intact. (*Id*.) Diagnosis revealed routine healing status of left ankle ORIF. (*Id*.) She was advised to continue physical therapy and to supplement it with a home exercise program, and to return in two months. (*Id*.)

On July 6, 2020, Plaintiff saw Dr. Allison J. Murray at Northwell Health ("Northwell") to establish new primary care. (*Id*. at ¶ 14.). She reported having more pain and difficulty ambulating since seeing her orthopedic surgeon last month. (*Id*.) On examination, Plaintiff was well-appearing and in no acute distress. (*Id*.) Her affect was normal, and insight and judgment were intact. (*Id*.) Dr. Murray recommended x-rays, physical therapy, and follow-up with orthopedics. (*Id*.) Shortly thereafter, on July 8, 2020, imaging of Plaintiffs left ankle revealed probable soft tissue swelling and a plantar calcaneal spur, and intact fixation hardware. (*Id*.)

On August 3, 2020, Plaintiff presented to a physician assistant at Branch Orthopedics with a chief complaint of left ankle pain. (*Id*. at ¶ 15.) She also endorsed progressive pain and swelling with prolonged standing and walking. (*Id*.) She reported that she recently switched physical therapists and was "starting to see small improvements." (*Id*.) Examination revealed limited range of motion "especially with eversion," mild swelling medially and laterally, and tenderness laterally and mild tenderness medially. (*Id*.) A neurovascular exam was normal. (*Id*.) Her mood and affect were appropriate. (*Id*.) Plaintiff was advised to continue physical therapy and to undergo x-rays of the ankle on return. (*Id*.) The examiner discussed hardware removal, continuing physical therapy, and taking anti-inflammatories as needed. (*Id*.)

On September 16, 2020, Plaintiff presented to a physician assistant at Branch Orthopedics with a chief complaint of left ankle pain. (*Id*. at ¶ 16.) Physical examination revealed mild swelling, tenderness, limited range of motion, and normal neurovascular findings.

(*Id*.) X-rays showed proper hardware positioning. (*Id*.) Her mood and affect were appropriate. (*Id*.) The physician's assistant indicated an impression of "status post left ankle ORIF with painful deep hardware." (*Id*.) Surgical options were discussed about removing painful hardware. (*Id*.) On September 17, 2020, Plaintiff saw Northwell's Dr. Adam Bitterman. (*Id*. at ¶ 17.) She complained of left ankle pain at a level 8 out of 10, with swelling. (*Id*.) The pain was made worse by walking. (*Id*.) She was taking NSAIDs. (*Id*.) On examination, Plaintiff was in no acute distress. (*Id*.) She had no swelling on inspection. (*Id*.) She had some positive tenderness. (*Id*.) She had full strength, intact sensation, and no obvious malalignment. (*Id*.) September 2020 x-rays showed that left ankle hardware was in good position. (*Id*.) Dr. Bitterman recommended a computed tomography ("CT") scan to further evaluate the etiology of Plaintiffs condition. (*Id*.)

On September 29, 2020, Plaintiff presented for a CT of the left ankle which revealed degenerative changes and plantar and dorsal calcaneal enthesophytes. (*Id*. at ¶ 18.) The CT revealed complete fracture healing and no evidence of hardware complications. (*Id*.) On October 22, 2020, Plaintiff returned to Dr. Murray. (*Id*. at ¶ 19.) She complained of anxiety and depression, reported it had been worsening due to ankle pain, and reported that sometimes depression and anxiety made her unable to get out of bed. (*Id*.) Dr. Murray prescribed some medications. (*Id*.) On examination, Plaintiff was well-appearing and in no acute distress. (*Id*.) Neurologically, she had no focal deficits. (*Id*.) Psychiatrically, she had a normal affect. (*Id*.) She had normal insight and judgment. (*Id*.)

On November 2, 2020, Plaintiff presented for physical consultative examination performed by Andrea Pollack, D.O. (*Id*. at ¶ 20.) Plaintiff told Dr. Pollack that she had constant level 9 out of 10 ankle and foot pain. (*Id*.) She reported that she had upcoming surgery in January 2021 for hardware removal. (*Id*.) Plaintiff was not using any assistive devices. (*Id*.) She also

reported hypertension since 2018 with occasional headaches. (*Id*.) With respect to activities, Plaintiff reported cooking two to three times a week, cleaning twice a week, doing laundry every two weeks, shopping once a week, and socializing with friends. (*Id*.)  On examination, Plaintiff was in no acute distress. (*Id*.)  Dr. Pollack noted that Plaintiff walked with a "gait limp" and was unable to walk on heels and toes. (*Id*.) She squatted one-quarter of the way down. (*Id*.) Plaintiff had a normal stance, used no assistive devices, needed no help getting on and off the examination table, and was able to rise from a chair without difficulty. (*Id*.) Physical examination revealed swelling of the lateral left ankle. (*Id*.) Plaintiff had range of motion limitations in the left ankle and 4/5 strength. (*Id*.)

Otherwise, she had full ranges of motion and strength elsewhere. (*Id*.) Dr. Pollack listed diagnoses of a history of left ankle fracture status post-surgery and hypertension with resultant headaches. (*Id*.) Dr. Pollack assessed Plaintiff with marked restriction in squatting; moderate restriction in standing, climbing stairs, kneeling, and walking; mild to moderate restriction in lifting, carrying, pushing, and pulling; and that she should avoid heights, operating heavy machinery, or activities that required heavy exertion or involved a risk of fall or injury. (*Id*.) On December 7, 2020, Plaintiff returned to Dr. Murray. (*Id*. at ¶ 21.) She reported that the medications for depression and anxiety had been helping. (*Id*.) On examination, she was well-appearing and in no acute distress. (*Id*.) She had no focal neurological deficits. (*Id*.) Psychiatrically, she had a normal affect, and intact insight and judgment. (*Id*.)

On December 23, 2020, Dr. Adam Bitterman completed a physical assessment of Plaintiffs abilities. (*Id*. at ¶ 22.) He identified Plaintiffs diagnosis as chronic left ankle pain and opined that Plaintiffs symptoms were severe enough to constantly interfere with Plaintiffs concentration to perform simple work-related tasks. (*Id*.) He further opined that Plaintiff is

unable to lift even less than ten pounds. (*Id*.) He further assessed Plaintiff with the need to lie down or recline during an 8-hour workday more than the regularly scheduled breaks. (*Id*.) Lastly, he opined that Plaintiff would be absent more than four times per month. (*Id*.) He also checked or circled form prompts that Plaintiff could stand or walk O hours in an eight-hour workday and wrote that she could not walk more than a block. (*Id*.) He indicated that Plaintiff was capable of sitting eight hours in an eight-hour workday, and had no limitations in using the hands or arms. (*Id*.)

On March 30, 2021, State agency medical consultant Dr. A. Sinha noted that Dr. Pollack's report mentioned that Plaintiff was scheduled to undergo surgery for hardware removal in January 2021, however no surgery was performed. (*Id*. at ¶ 23.) Instead, Plaintiff reported she had a new doctor, Dr. Salomon, who did not respond to contact and follow-up. (*Id*.) Dr. Sinha indicated that she could not project a residual functional capacity assessment without knowing the status of the referenced surgery. (*Id*.) On May 20, 2021, Plaintiff saw Dr. Murray; she wanted a referral to pain management. (*Id*. at ¶ 24.) She reported that she had been unable to work due to pain and 'must return to work by May to keep her job." (*Id*.) On examination, Plaintiff was well-appearing and in no acute distress. (*Id*.) She had a normal affect, and intact insight and judgment. (*Id*.) Dr. Murray issued the pain management referral and continued the Xanax prescription as needed for anxiety. (*Id*.)  Dr. Murray noted that Plaintiff was taking her other medication as needed instead of as prescribed, indicated that the medication could be stopped if Plaintiffs symptoms were not severe, and if Plaintiffs anxiety worsened she could return for follow-up to restart it. (*Id*.)

On June 28, 2021, Vladimir Salomon, DO completed a physical assessment of Plaintiffs abilities. (*Id*. at ¶ 25.) Dr. Salomon identified the following diagnosis for Plaintiff: complex

regional pain syndrome of the left foot and ankle. (*Id.*) He opined that Plaintiff would need to recline or lie down in excess of the typical breaks provided at the workplace. (*Id.*) He opined that Plaintiff can occasionally lift up to ten pounds but never lift more. (*Id.*) He also assessed Plaintiff with the need to take unscheduled breaks every hour for a duration of fifteen minutes. (*Id.*) Lastly, he opined that Plaintiff would be absent from work as a result of her impairments more than four times per month. (*Id.*) He also checked form prompts that Plaintiff could sit for two hours and stand or walk for one hour in an eight-hour workday. (*Id.*) He indicated that Plaintiff could walk two blocks. (*Id.*) He indicated that Plaintiff could use her hands, fingers, and arms for all activities for 100% of an eight-hour workday. (*Id.*)

On September 15, 2021, Plaintiff saw Northwell's Dr. Dheeraj Khanna for a consultation on obesity, shortness of breath, and sleep apnea. (*Id.* at ¶ 26.) Plaintiff mentioned having limited exercise since her ankle surgery. (*Id.*) On examination, Plaintiff was in no acute distress. (*Id.*) She had no extremity edema. (*Id.*) She had no focal neurological deficits. (*Id.*) Dr. Khanna noted that Plaintiff was morbidly obese. (*Id.*) Dr. Khanna provided weight management counseling, including encouragement to increase physical activity. (*Id.*) The same day in September of 2021, Plaintiff received a left lumbar sympathetic ganglion block as treatment for chronic regional pain syndrome ("CRPS") type 1[1] of the left lower extremity performed by Vladimir H. Salomon, DO. (*Id.* at ¶ 27.)

On October 18, 2021, Plaintiff presented by teleconference for a comprehensive mental assessment performed at Compass Health. (*Id.* at ¶ 28.) She presented at the encouragement of a

---

[1] Type 1 CRPS 1, "formerly known as reflex sympathetic dystrophy ("RSD"), is a clinical syndrome of variable course and unknown cause characterized by pain, swelling, and vasomotor dysfunction of an extremity. This condition is often the result of trauma or surgery." *See* https://emedicine.medscape.corn/article/334377-overview?form=fpf.

close friend. (*Id.*) She reported that she lost her mom on July 31 and her job terminated her position in August, and she had been feeling more depressed lately, crying almost every day, and "going through it lately and needs to get her mental health under control." (*Id.*) Plaintiff mentioned that she felt like someone was always watching her because she had a lawsuit against Carnival Cruise. (*Id.*) She said that on the cruise she had to walk around for seven days on a broken ankle because they did not want to see her in the infirmary. (*Id.*) She reported symptoms including hyperventilating when she felt like she could not be as mobile as she wanted due to her ankle, flashbacks of falling and injuring her ankle during the cruise, difficulty concentrating from everything that was going on, and racing thoughts. (*Id.*) Plaintiff had a PHQ-9 score of 21 and a GAD-7 score of 19. (*Id.*) Mental status examination revealed depressed mood, depressed affect, fair insight, and fair judgment. (*Id.*) Plaintiff had normal attention. (*Id.*) She had no memory impairment. (*Id.*) She had normal eye contact, calm motor activity, and cooperative behavior. (*Id.*) Following examination, the evaluating social worker assessed that Plaintiff met the criteria for major depressive disorder, single episode, unspecified and recommended weekly therapy. (*Id.*)

In therapy with another social worker on October 28, 2021, Plaintiff had a depressed mood and consistent affect, and otherwise normal eye contact, appropriate and cooperative manner and conduct, fair insight and judgment, no intent of self-harm, normal thought process, and normal memory. (*Id.* at ¶ 29.) The social worker summarized that Plaintiff was undergoing life stressors, for which she should implement self-care strategies and coping skills. (*Id.*) In a psychiatric evaluation on November 2, 2021, Plaintiff reported a chief complaint of "sad and can't sleep." (*Id.* at ¶ 30.) She discussed her ankle injury and said she "still limps and cannot

work as a surgery tech anymore currently." (*Id*.) She said she had thoughts of wishing she were dead on most days, without any plan or desire to act on them. (*Id*.)

Plaintiff rated her depression at 10 out of 10 and anxiety at 8 out of 10, with various associated symptoms. (*Id*.) Plaintiff's hobbies were playing bingo and going to movies. (*Id*.) On mental status examination, Plaintiff described her mood as "sad," and had a congruent, sad, at times tearful, normal range affect. (*Id*.) She had calm and cooperative behavior, good eye contact, a linear and goal-directed thought process, intact associations, no suicidal ideation, good insight and judgment, full orientation, intact memory, normal language, appropriate attention span and concentration, and appropriate cognition. (*Id*.) Noting that Plaintiff had been on a low dose of medication off and on for the past six months, the clinic took over prescribing Plaintiff's medications by increasing the dosage and adding a medication for sleep. (*Id*.)

In a wellness plan two days later, Plaintiff mentioned that her need was "for the worrying to be over, need to be able to have an income, I need to feel independent." (*Id*. at ¶ 31.) She identified her abilities or strengths as an ability to talk to people and to take care of herself. (*Id*.) In a therapy session that day, Plaintiff mentioned not wanting to do much; the therapist "explored options for walking at Stephens Lake when the weather is appropriate. Felicia and Clinician looked at the weather app to ensure feasibility." (*Id*.) In a report of contact dated May 14, 2021, Plaintiff said she had never seen a psychiatrist and was not alleging a psychiatric impairment. (*Id*. at ¶ 32.)

In pertinent part, at the November 2021 ALJ hearing, Plaintiff testified that she is 48 years old and completed the twelfth grade. (*Id*. at ¶ 33.). She was currently living in Missouri as her mother had died in July 2021, and she was there "getting her house and stuff cleaned out." (*Id*.) Over the past fifteen years, she had only worked as a surgical technologist. (*Id*.) After

stopping work in September 2019, she received short-term disability from her employer. (*Id*.)
She said her ankle swells constantly or five out of seven days a week and sometimes she cannot
even put a shoe on her left foot. (*Id*.)  There are no particular triggers for the swelling. (*Id*.)
Plaintiff said her foot was swelling while sitting at the hearing. (*Id*.)  Her pain management
doctor, Dr. Salomon, has given her two blocks in the lower part of her back that did not work.
(*Id*.) She stopped seeing her surgeon, Dr. Bitterman, after starting with Dr. Salomon. (*Id*.)

Even sitting does not control the swelling. (*Id*.) Plaintiff testified that she had to elevate
her foot above her heart at least three to four times per day for two and one-half hours to help
with the swelling. (*Id*.) She also applies ice and wears pressure socks. (*Id*.) She testified that she
could sit for two and one-half hours in a regular chair. (*Id*.) She could stand for an hour and one-
half. She could walk for 30 to 40 minutes before needing a break. (*Id*.) She said she could lift
"[m]aybe less than ten pounds" or "[n]othing too heavy" until her ankle would "bother" her. (*Id*.)
She had no problems bending. (*Id*.) Bending at the knees or crouching or kneeling was a little
painful in the ankle. (*Id*.) She had no difficulty using her hands or arms. (*Id*.)

Plaintiff said her depression and anxiety also affect her ability to work as she experiences
crying spells and is "nervous all the time." (*Id*. at ¶ 34.)  Her problems started when her mother
died in July 2021. She had started treatment one month before the hearing (October 2021) at
Compass Health.[2] (*Id*.) She sees a therapist every two weeks and a psychiatrist once per month.
Prior to that, her primary care doctor prescribed medication. (*Id*.)  Plaintiff said she had difficulty
understanding and focusing, but her memory was okay. (*Id*.) She had no problems being around
people. (*Id*.)

---

[2] The parties note that the ALJ kept the record open and after receipt of the records considered them. (*Id*.)

The vocational expert testified that an individual with Plaintiff's vocational background and limitations corresponding to the RFC finding (including the limitation to only simple work) could not perform her past work as a surgical technician that was skilled and light in exertion. (*Id*. at ¶ 35.)  The individual could perform sedentary, unskilled (SVP of 2)[3] occupations such as order clerk, charge account clerk, or assembler. If also limited to occasional interaction with others, the person could perform the assembler job, and other assembly-type jobs like final assembler and bench hand. (*Id*.) The vocational expert further testified that if the individual needed to elevate her left leg for at least fifteen percent of the workday, then such an individual would be unable to perform any of the jobs identified. (*Id*.)  The vocational expert also testified that if an individual required unscheduled breaks or absences that would exceed fifteen percent of a work schedule, then all work would be precluded. (*Id*.)

## II.  *<u>Procedural History</u>*

Plaintiff commenced the instant action on January 17, 2023, seeking this Court's review of the decision of the Commissioner, pursuant to Section 205(g) and/or Section 1631 of the Act. (ECF No. 1.) Plaintiff asserted that the ALJ's Decision denying his application for disability benefits was "not supported by substantial evidence" and "contrary to law and regulation." (*Id*. at ¶ 8.) On May 26, 2023, the parties consented to the undersigned's jurisdiction for all purposes, and the case was reassigned to the undersigned on May 31, 2023. (*See* ECF Nos. 8, 9.) On November 28, 2023, Plaintiff filed his Motion for Judgment on the Pleadings (ECF No. 15), and, that same day, the Commissioner filed a Cross-Motion for Judgment on the Pleadings. (ECF No. 15-2.)

---

[3] Specific vocational preparation ("SVP") levels of 1 to 2 corresponds to unskilled work, 3 to 4 to semi-skilled work, and 5 to 9 to skilled work. (*Id*.)

### III.    *The Parties' Contentions*

#### A.    *Plaintiff's Motion for Judgment on the Pleadings*

In support of her Motion for Judgment on the Pleadings, Plaintiff argues: (i) the ALJ

erred in assessing the opinion of Plaintiff's pain management, doctor, Dr. Solamon, and (ii) the

ALJ erred by "crafting" the mental RFC without first properly developing the record. (ECF No.

15-1.) *With respect to the first point*, Plaintiff identifies that on June 28, 2021, Vladimir

Salomon, DO completed a physical assessment of Plaintiff's abilities:

> Dr. Salomon identified the following diagnosis for Plaintiff: complex regional pain
> syndrome of the left foot and ankle. He opined that Plaintiff would need to recline or lie
> down in excess of the typical breaks provided at the workplace. He opined that Plaintiff
> can occasionally lift up to ten pounds but never lift more. He also assessed Plaintiff with
> the need to take unscheduled breaks every hour for a duration of fifteen minutes. He
> opined that Plaintiff would be absent from work as a result of her impairments more than
> four times per month.

*Id*. at 11.

Plaintiff further identifies the ALJ found the opinion of Dr. Salomon to be only partially

persuasive—crediting Dr. Salomon's limitations on lifting and carrying but rejecting Dr.

Salomon's findings otherwise, and, in doing so, the ALJ relied on evidence of 'a healed fracture,

and documentation of improvement and reduced pain[.]'" (*Id*. at 11-12.) Plaintiff contends the

ALJ's analysis "runs afoul of the governing regulations because it is based on a clear

mischaracterization of the record." (*Id*. at 12.)

Specifically, Plaintiff argues there is a "wealth of evidence that documents Plaintiff's

severe and persistent pain stemming from her September 2019 fracture rather than evidence of

improvement[,]" and,  "[w]hile Plaintiff's later x-ray imaging does indeed eventually reveal a

healed fracture, the contemporaneous treatment notes document persistent pain despite said

16

healing." (*Id*.) Plaintiff identifies that on November 22, 2019,[4] June of 2020, August 3, 2020,

September 16, 2020, she presented at Branch Orthopedics with a "chief complaint of ankle

pain[,]" and, "objective imaging of Plaintiff's ankle substantiates her reports of pain[:]"

> In June of 2020, Plaintiff was noted to have continued pain and swelling with activities. July 8, 2020 imaging of Plaintiff's left ankle revealed soft tissue swelling and a plantar calcaneal spur. On August 3, 2020, [e]xamination revealed limited range of motion 'especially with eversion,' swelling medially and laterally, and tenderness laterally and medially. Plaintiff was advised to continue physical therapy and to undergo x-rays of the ankle.

> On September 16, 2020, [p]hysical examination and x-ray imaging revealed 'status post left ankle ORIF with painful deep hardware." Surgical options were discussed about removing painful hardware. On September 29, 2020, Plaintiff presented for a CT of the left ankle which revealed degenerative changes and plantar and dorsal calcaneal enthesophytes.

*Id*. at 12-13.

Plaintiff maintains the "wealth of evidence" presented "contradicts the ALJ's finding that

the 'healing' of Plaintiff's fracture resolved her pain and related ankle issues." (*Id*. at 14.)[5]

Plaintiff argues that the ALJ's error was not harmless because: (i) Dr. Salomon

opined that Plaintiff would need to take unscheduled breaks every hour for a duration of fifteen

minutes, and that Plaintiff would be absent from work as a result of her impairments more than

---

[4] On November 22, 2019, Plaintiff was noted to use a CAM walker and crutches. (*Id*. at 12.) Physical examination revealed tenderness and limited range of motion. (*Id*. at 13.) Plaintiff was assessed with status post left ankle ORIF-healed per x-ray imaging. (*Id*.) Plaintiff contends that even after the "healing" of the fracture at issue, Plaintiff presented for physical therapy performed by Gregory Beach in March of 2020, which revealed edema of the left foot and ankle which was treated with extensive retrograde massage. (*Id*.) Plaintiff argues even post "healing," she was noted to only be partial weight bearing on the left lower extremity and to require ambulation aides including axillary crutches and CAM boot. (*Id*.)

[5] Plaintiff further maintains that even the diagnosis itself identified by Dr. Solamon to support his assessed limitations – complex regional pain syndrome, which is a term describing excess and prolonged pain and inflammation that follows an injury to the leg – indicates that it is not the fracture itself that is now the source of Plaintiff's limitations, but rather the *residual effects* of said fracture. (*Id*. at 14) (emphasis added).

four times per month, (ii) the vocational expert testified that both of these are disabling limitations, and, therefore, (iii) if the ALJ had properly credited the opinion of Dr. Salomon then a finding of disability would have been warranted based on vocational expert testimony, such that remand is warranted on this ground alone. (*Id*.)

*With respect to the second point*, Plaintiff argues that the ALJ erred in assessing Plaintiff with a mental RFC limiting her to simple tasks without first properly developing the record. (*Id*.) Plaintiff argues it is "unclear" how the ALJ arrived at said mental RFC "in the absence of any relevant medical opinions for guidance or an explanation otherwise creating a logical bridge between the crafted mental RFC and the evidence of record." (*Id*.) Plaintiff argues that the matter at bar "deals with formal diagnoses of depression and anxiety[:]"

> [T]he raw psychiatric data provides that on October 18, 2021, Plaintiff presented for a comprehensive mental assessment performed at Compass Health. Plaintiff was assessed with a PHQ-9 score of 21, which is indicative of severe depression, and a GAD-7 score of 19, which is indicative of severe anxiety. Mental status examination revealed depressed mood, depressed affect, fair insight, and fair judgment. Following examination, Plaintiff was assessed with major depressive disorder, single episode, unspecified and recommended for weekly therapy. Plaintiff's subsequent mental health records reveal increased depression and significant sleeping issues. Further, mental status examination revealed thoughts of wishing that she were dead. Additionally, December 2021 records note that Plaintiff was prescribed Sertraline and Xanax as treatment for depression and anxiety symptoms.

(*Id*. at 15.) Plaintiff maintains that "[t]his is not a sufficiently commonsense case to warrant resolution by an ALJ without procuring meaningful opinion evidence" and "[g]iven the absence of mental health opinions," the case should be remanded for further proceedings so that the ALJ can provide further explanation and further development of the record. (*Id*. at 15-16.)

## B.    *Defendant's Cross-Motion for Judgment on the Pleadings*

In support of his Cross-Motion for Judgment on the Pleadings, Defendant argues: (i) substantial evidence supports the ALJ's analysis of Dr. Salomon's form responses, and (ii)

substantial evidence supports the ALJ's analysis that any mental difficulties would be more than accommodated by the restriction to simple tasks, and, therefore, no further development of the record was needed. (ECF No. 15-4 at 2.) *With respect to the first point*, Defendant argues that the ALJ properly "evaluated Dr. Salomon's form responses, compared them to the overall record evidence, and explained why, putting aside the lifting response that was consistent with sedentary work, Dr. Salomon's [] responses were an extreme portrayal of Plaintiff's limitations[,]" and "[s]ubstantial evidence supports the ALJ's reasoning." (*Id*. at 17.)

Defendant contends the evidence showed routine healing of Plaintiffs fracture, which belied such extreme limitations as Dr. Salomon checked in his form responses." (*Id*. at 18.) By November 2019, for instance, Defendant identifies that Plaintiffs orthopedics clinic advised her to start transitioning to weightbearing as tolerated, and, a CT scan in September 2020 showed that Plaintiff's fracture had completely healed, without any evidence of hardware complications. (*Id*.) According to Defendant, these findings are consistent with the assessment by Dr. Ceaser that, within 12 months of her alleged onset date in September 2019, Plaintiff would be capable of a range of sedentary work. (*Id*. at 19.) Likewise, Defendant contends Dr. Salomon's "extreme responses were incongruent" with Plaintiff's own statements as to improvement in her symptoms and her admissions regarding her ability to stand, walk, and perform activities. (*Id*.)

Defendant further argues that Dr. Salomon "provided no explanation for his extreme form responses." (*Id*.) Defendant claims Salomon "appeared to only have just started treating Plaintiff when he formulated his opinion in June 2021" and  "merely checked solicited form prompts while stating that Plaintiff had a diagnosis of complex regional pain syndrome ("CRPS") and noting that it was 'possible' to have 'stomach upset' from taking Ibuprofen" – a diagnosis which, according to Defendant, "does not in itself show totally disabling functional limitations." (*Id*.) Defendant maintains that the ALJ's characterization of the record was

accurate, as the ALJ's restrictive RFC finding for a reduced range of sedentary work acknowledged that Plaintiff had significant residual limitations in standing and walking, and "[s]edentary work represents a significantly restricted range of work, and individuals with a maximum sustained work capability limited to sedentary work have very serious functional limitations.'" (*Id*. at 20) (citing 20 C.F.R. Pt. 404, Subpt. P., App. 2 § 201.00(h)(4)).

In the context of the 12-month durational requirement[6] and the claimant's burden to prove totally work-preclusive disability through that period and beyond, Defendant argues the ALJ properly focused on Plaintiff's admissions of significant functional improvement:

> For instance, by March 2020, well within 12 months of her injury, in physical therapy Plaintiff reported ongoing difficulties with activities like running or hopping, but little difficulty in walking two blocks or a mile or standing as long as an hour, and no difficulty in walking between rooms or performing light or even heavy home activities..
>
> While, as the ALJ noted, some of Plaintiffs allegations for purposes of her disability claim were more extreme, for instance her reports that due to swelling, she had to spend two hours each day holding her ankle above heart level, an ALJ is not required to accept a claimant's most restrictive accounts and can consider the lack of corroborating evidence as well as 'inconsistencies between [the claimant']s allegations at the hearing and [her] previous statements regarding [her] symptoms and daily activities.'
>
> And, to reiterate a point Plaintiffs argument persists in ignoring, the ALJ agreed that Plaintiff was precluded from her past work that required her to be on her feet all day. In the context of the claimant's burden to prove disability from not just her prior job but any substantial gainful activity, Plaintiffs own admissions in key part support the finding that she was capable of a range of sedentary work.

(*Id*. at 21-22) (quoting *Rock v. Colvin,* 628 F. App'x I, 3 (2d Cir. 2015)).

Finally, Defendant contends Plaintiff's characterizations that imaging results support her claim of totally work- preclusive disability are "selective and uncorroborated by anything any doctor ever stated." (*Id*. at 22.) Defendant identifies the ALJ considered the CT scan from

---

[6] Under the Act's 12-month durational requirement, Defendant explains "limitations that do not restrict a claimant's ability to function in the work- setting over a period of at least 12 months are immaterial to the RFC finding." (Id. at 21) (citing 42 U.S.C. §§ 423(d)(l)(A), 1382c(a)(3)(A)).

September 2020, noting that it showed "complete fracture healing and no evidence for hardware complications[,]" and Dr. Bitterman, the doctor who sent Plaintiff for this CT, on examination noted some tenderness but otherwise that Plaintiff was in no acute distress, had no swelling, and had full strength, intact sensation, and no obvious malalignment. (*Id.* at 22-23.)[7]

Defendant additionally emphasizes that "to the extent Plaintiff's argument implies that a CRPS diagnosis somehow means that any subjective allegations of disability must be viewed as credible even in the absence of any significant objective findings, such an implication is incorrect…[o]n the contrary, on subjective issues where the claimant bears the ultimate burden of proof, deference to a reasonable factfinder's discretion is at its zenith." (*Id.* at 24.) Defendant contends the ALJ recognized both Plaintiff's left ankle fracture, its status as a residual impairment, and the CRPS diagnosis, and accepted that Plaintiff had "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,] however, the ALJ found that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported" primarily because Plaintiff's residual ankle difficulties, whether physical or mental such as fatigue or difficulty focusing, were not quite so limiting as to preclude some sedentary work with simple tasks, a point which Defendant contends is "corroborated by substantial medical opinion and other medical evidence, including many of Plaintiff's own admissions." (*Id.* at 25.)[8] Overall, Defendant maintains the ALJ had "ample substantial evidence to conclude as

---

[7] While Plaintiff points to a physician assistant's diagnosis of "painful deep hardware" prior to the CT scan showing the hardware in good position, Defendant notes the surgery to remove it was cancelled, which, according to Defendant, "further illustrates the inherently subjective nature of Plaintiff's allegations, and the revisionist nature of the argument's attempt to find support for same in the imaging results." (*Id*,)

[8] For example, Defendant cites Plaintiff's testimony that she was capable of standing for an hour and a half and walking for 40 minutes, her admissions and descriptions of her functioning during physical

a reasonable factfinder that Plaintiff's residual ankle difficulties, granting that they precluded work that required mostly standing or walking, would still permit some sedentary work." (*Id.*)

*As to the second point*, Defendant argues substantial evidence supports the ALJ's analysis that any mental difficulties would be more than accommodated by the restriction to simple tasks and no further development of the record was needed. (*Id.*) *First*, Defendant identifies that Plaintiff concedes that she lacks any opinions to support greater restrictions, which, according to Defendant, "means only that she cannot meet her burden and overcome the ALJ's reasonable analysis under the substantial evidence standard." (*Id.* at 27.) As the ALJ considered, Defendants claim it was not until fairly late in 2020 that Plaintiff began reporting mental health symptoms to her internist:

> [T]he doctor to whom Plaintiff reported these symptoms, however, observed that she was well-appearing, in no acute distress, and had normal affect, insight, and judgment. Mental status examinations in visits with another source in June, August, and September 2020 also revealed that Plaintiffs mood and affect were appropriate. Perhaps more remarkably, even long thereafter-and as late as six months before her disability hearing- Plaintiff was still insisting that she was *not* claiming a psychiatric condition as the basis for her alleged inability to work.
>
> She did not see a psychiatrist or therapist until October 2021, one month before her hearing. Even then, as the ALJ considered, Plaintiffs mental status examinations, apart from aspects relating to a depressed mood, showed normal findings, including intact attention, concentration, memory, and cognition.

(*Id.* at 27-28.)

*Second*, Defendant argues the ALJ additionally considered Plaintiff's reports of mental health symptoms were, by her own descriptions, associated in key part with the loss of her mother in July 2021, and, were also proximate to Plaintiff's ultimate loss of her job

---

therapy, and the fact that, just a few days before her disability hearing, in a psychotherapy session, Plaintiff was exploring a coping mechanism of taking walks at a lake. (*Id.*)

with her employer. (*Id.* at 28.) Defendants identify another apparent stressor was the pendency of her lawsuit against Carnival Cruise on whose ship she slipped on water and injured her left ankle, in which Plaintiff was concerned that "someone is always watching her due to having a lawsuit with Carnival Cruise." (Id.) Defendants argue "situational stressors, however, irrespective of how sympathetic, are not equivalent to disability under the Act" rather, under the Act, "a claimant's medical conditions must cause functional deficits that render her incapable of any work over a period of at least 12 months." (*Id*.) Defendant further notes that "even during Plaintiff's most significant subjective reports of symptoms, mental status examinations still revealed normal attention and thought processes." (*Id*.)

In sum, Defendant maintains substantial evidence supports the ALJ's reasoning that, while Plaintiff's conditions precluded her past skilled work that involved mostly standing or walking, they did not preclude her over at least 12 months from performing a range of some simple, unskilled sedentary work, and, therefore, the ALJ's denial of benefits should be affirmed. (*Id.* at 29.)

**C.    *Plaintiff's Reply in Support***

In Reply, Plaintiff reiterates that "[t]he matter at bar deals with formal diagnoses of depression and anxiety" and, "the raw psychiatric data provides[:]"

> On October 18, 2021, Plaintiff presented for a comprehensive mental assessment performed at Compass Health. Plaintiff was assessed with a PHQ-91 score of 21, which is indicative of severe depression, and a GAD-72 score of 19, which is indicative of severe anxiety. Mental status examination revealed depressed mood, depressed affect, fair insight, and fair judgment. Following examination, Plaintiff was assessed with major depressive disorder, single episode, unspecified and recommended for weekly therapy.
>
> Plaintiff's subsequent mental health records reveal increased depression and significant sleeping issues. Further, mental status examination revealed thoughts of wishing that she were dead. Additionally, December 2021 records note that Plaintiff was prescribed

Sertraline and Xanax as treatment for depression and anxiety symptoms.

(ECF No. 15-5 at 2.) Plaintiff maintains this not a "sufficiently commonsense case to warrant resolution by an ALJ without procuring meaningful opinion evidence[,] and, "[g]iven the absence of mental health opinions," Plaintiff again requests remand for further proceedings so that the ALJ can provide further explanation and possibly further development of the record. (*Id*.) Overall, Plaintiff "contends that remand is warranted for proper development of the record with regard to Plaintiff's mental impairments rather than reliance on the ALJ's impermissible lay interpretation of Plaintiff's psychiatric records." (*Id*. at 4.)

## DISCUSSION

### I.    *The Legal Framework*

When determining if the Social Security Administration's denial of disability benefits was warranted, the court will review *de novo* "whether the correct legal principles were applied and whether substantial evidence supports the decision." *Balotti v. Comm'r of Soc. Sec.*, 605 F. Supp. 3d 610, 613 (3d Cir. 2022) (quoting *Butts v. Barnhard*, 388 F.3d 377, 384 (2d Cir. 2004)). Here, the correct legal principles are the five-step inquiry described as the "Social Security Disability Standard" outlined below.  "If the reviewing court is satisfied that the ALJ applied the correct legal standards, then the court must 'conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision.'" *Balotti*, *605* F. Supp. 3d at 613 (quoting *Brault v. Soc. Sec. Admin'n Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam)).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (quoting  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Cardin v. Comm'r of Soc. Sec.*, No. 23-755, 2024 WL 2180216, at *1 (2d Cir. May 15, 2024) (citing *Brault*

*v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012)) ("The substantial evidence standard requires that we accept the agency's factual findings unless a reasonable factfinder would be compelled to conclude otherwise."). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Snell v. Apfel*, 177 F.3d 128, 132 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1984) (per curiam)).

As such, the Court will not look at the record in "isolation but rather will view it in light of other evidence that detracts from it." *State of New York ex rel. Bodnar v. Sec. of Health and Human Servs.*, 903 F.2d 122, 126 (2d Cir. 1990). An ALJ's decision must be supported by "adequate findings . . . having rational probative force." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *see also Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (under the substantial evidence standard of review, the plaintiff must show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in the record, rather than merely disagree with the ALJ's weighing of the evidence or argue that evidence in the record could support his or her position).

"Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Thus, an individual must be found disabled when his or her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.*

§ 423(d)(2)(A). The correct legal principle that ALJs must undertake to ascertain a claimant's status is the sequential five-step inquiry of the Social Security Disability Standard outlined by the Commissioner's regulations. *See* 20 C.F.R. §§ 404.1520, 416.920. According to this framework, a claimant will be found disabled if the Commissioner determines:

> (1) that the claimant is not working, (2) that he has a "severe impairment," (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find his disabled if (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)).

At step one, the Plaintiff must prove s/he is not employed in "substantial gainful activity" ("SGA").   "[SGA] is work activity that is both substantial and gainful." 20 C.F.R. § 404.1572. "'Substantial work activity' is work activity that involves doing significant physical or mental activities." (*Id.* § 404.1572(a)). "Gainful work activity" is work that is usually done for pay or profit, "whether or not a profit is realized." (*Id.* § 404.1572(b)).

At step two, the Plaintiff must prove s/he is significantly limited in his/her physical or mental abilities to perform basic work activities. "Basic work activities" are "activities and aptitudes necessary to do most jobs." *Sharmara A. v. Comm'r of Soc. Sec.*, No. 23-CV-6171 (LJV), 2023 U.S. Dist. LEXIS 230336, at *5 (W.D.N.Y. Dec. 28, 2023) (quoting  20 C.F.R. § 404.1522(b)).

At step three, Plaintiff must prove that the impairments meet or are equivalent to one of the impairments listed in 20 C.F.R. 404 to render her as "disabled." "If the severe impairments do not meet or equal a listed impairment, an administrative law judge assesses the social security claimant's residual function capacity based on all the relevant medical and other evidence in the

case record." *McAllister v. Colvin*, 205 F. Supp. 3d 314, 327 (E.D.N.Y. 2016) (quoting 20 C.F.R. § 404.1520(e)). At step four, the plaintiff must prove that he is incapable of meeting the physical and mental demands of work; and if the ALJ failed to develop the record. At step five, the Commissioner bears the burden to demonstrate that "there is work in the national economy that the claimant can do" upon consideration of the plaintiff's RFC, age, education, and prior work experience, are there any other jobs Plaintiff could perform. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

Pursuant to amended regulations, claims filed after March 27, 2017[9] will not apply a "presumption of controlling weight" to a treating doctor's opinion. *Balotti*, 605 F. Supp. 3d at 616. Instead, the revised regulations for evaluating a doctor's opinion evidence place substantial emphasis on two factors: supportability and consistency. *Id.*, *See* 20 C.F.R. § 404.1520 (a). To avoid legal error, "[a]n ALJ must not only apply supportability and consistency in evaluating medical source opinions but also must explain the analysis of these factors in the decision." *Balotti*, 605 F. Supp. 3d at 617; 20 C.F.R. § 404.1520 (c)(b)(2). The first factor of supportability "refers to the extent to which a medical source's opinion is supported by objective medical evidence and the medical source's explanations." *Balotti*, 605 F. Supp. 3d at 616; 20 C.F.R. § 404.1520 (c)(1).

A medical opinion is considered persuasive when it is more relevant to the objective medical evidence and the medical source's explanations. *See id.* The second element of consistency "refers to the extent to which a medical source's opinion is consistent with other medical or non-medical sources." *Id.* "[I]f two or more medical opinions or prior administrative

---

[9] Until March 27, 2017, regulations required application of the so-called "treating physician rule" pursuant to which the opinion of a claimant.s treating physician presumptively was entitled to "controlling weight." 20 C.F.R. § 404.1520 (c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).

medical findings are both equally well supported and consistent," the ALJ must consider other factors listed in 20 CFR 404.1520. *See* 20 C.F.R. § 404.1520. These factors are "Relationship with the claimant," "Extent of the treatment relationship," and "Examining relationship." *See id.* § 404.1520 (c)-(e).

The Court will not defer to the Commissioner's determination if it is a product of legal error resulting from inadequate application of supportability or consistency. *See Balotti*, 605 F. Supp. 3d, 613 (quoting *Dunston v. Colvin*, 14-CV-3859, 2015 U.S. Dist. LEXIS 438, 2015 WL 54169 at *4 (S.D.N.Y. Jan 5, 2015)). "After reviewing the Commissioner's determination, the district court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing.'" *Catsigiannis v. Astrue*, No. 08-CV-2177 ENV LB, 2013 WL 2445046, at *3 (E.D.N.Y. June 4, 2013) (quoting *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005)); *see also* 42 U.S.C. § 405(g).

"Remand for further development of the evidence is appropriate where there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Kirkland v. Astrue,* No. 06 CV 4861(ARR), 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008); *see also Butts,* 388 F.3d at 386 (internal citations omitted) ("Remand for additional proceedings is particularly appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, further findings would ... plainly help to assure the proper disposition of a claim."). "On the other hand, when there is persuasive proof of disability in the record and no apparent basis to conclude that a more complete record might support the Commissioner's decision, further evidentiary development would not serve any purpose. In that case, the court should reverse the

Commissioner's decision and remand solely for the calculation of benefits." *Kirkland*, No. 06 CV 4861(ARR), 2008 WL 267429, at *8 (internal citations omitted) (cleaned up).

## II.    *Analysis*

As stated, Plaintiff asserts that the ALJ's decision should be reversed because: (i) the ALJ erred in assessing the opinion of Plaintiff's pain management, doctor, Dr. Solamon, and (ii) the ALJ erred by "crafting" the mental RFC without first properly developing the record. *See* ECF No. 15-1. In response, Defendant counters that the ALJ's decision is free of legal error because (i) substantial evidence supports the ALJ's analysis of Dr. Salomon's form responses, and (ii) substantial evidence supports the ALJ's analysis that any mental difficulties would be more than accommodated by the restriction to simple tasks, and, therefore, no further development of the record was needed. *See* ECF No. 15-4 at 2. Defendant specifically contends that the Court should uphold the Commissioner's decision because substantial evidence supports the Commissioner's finding that the Plaintiff's impairments do not preclude her over at least 12 months from performing a range of some simple, unskilled sedentary work. *Id.* at 29. The Court considers each of the parties' arguments on these points in turn.

### A.    *The ALJ Adequately Performed His Affirmative*
### *Duty to Develop the Administrative Record*

Prior to determining if the Commissioner's final decision is backed by substantial evidence under 42 U.S.C. § 405(g), the Court must first ensure that the ALJ granted the plaintiff a full hearing under the Secretary's regulations and thoroughly developed the administrative record. *See Scott v. Astrue*, 2010 U.S. Dist. LEXIS 68913, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health& Hum. Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)).  The ALJ must develop the record even where the claimant has legal counsel. *See Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). The Appeals Council then evaluates the entire record, including any new and material evidence submitted if it is chronologically relevant, to determine if the ALJ's

action, findings, or conclusion is contrary to the weight of the evidence currently on record. *See* 20 C.F.R. § 404.970(b); *Bushey v. Colvin*, 552 F. App'x 97, 98 (2d Cir. 2014).

Relevant here, the duty to develop the record does not extend to speculative or vague claims of missing evidence or require the ALJ to obtain the alleged missing evidence on behalf of the claimant. *See e.g.*, *Perez*, 77 F.3d at 48 (rejecting Plaintiff's contention that the ALJ failed to develop the record by not obtaining information from the physicians who had ordered the CT of her brain and the MRIs of her spine, where the "ALJ stated that he considered the reports of the results of the CT and MRI tests, and that he found that they did not provide evidence demonstrating that [Plaintiff] was disabled" and where "there [was] nothing to indicate that the reports were inconclusive[,]" and further noting that "the ALJ was not obligated to request further information from the doctors who had ordered the CT and MRIs."). Nor is the ALJ required to "solicit opinion evidence where an ALJ can reach an RFC finding supported by substantial evidence." ECF No. 15-4 at 26; *see also Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 Fed.Appx. 29, 34 (2d Cir. 2013)) ("Where 'the record contains sufficient evidence from which an ALJ can assess the claimant's residual functional capacity,' a medical source statement or formal medical opinion is not necessarily required"); *Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) ("[W]e do not think that the ALJ had any further obligation to supplement the record by acquiring a medical source statement from one of the treating physicians.").

Here, the Court finds the ALJ's assessment of Plaintiff with a mental RFC limiting her to simple tasks was supported by substantial evidence, and that no further development of the record was needed on this issue. In evaluating Plaintiff's mental RFC, the ALJ considered mental status examinations findings, which revealed the following:

In understanding, remembering or applying information, [Plaintiff] has no limitation. At a mental status examination on October 18, 2021, [Plaintiff] had no memory impairment and normal perceptions. At the hearing, claimant also testified that she has no memory issues. As such, she has no limitation in this area.

In interacting with others, the [Plaintiff] has a mild limitation. At a mental status examination on October 18, 2021, claimant was cooperative with normal eye contact, language and motor activity. However, in November 2021 claimant reported not wanting to do much or be around people. Given some isolative behavior, claimant has a mild limitation in this area.
With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. At a mental status examination on October 18, 2021, claimant had normal attention. However, she reported anxiety with panic attacks and difficulty concentrating. At the hearing, claimant reported difficulty concentrating. [Affording Plaintiff] the benefit of every inference, she has a moderate limitation in this area.

As for adapting or managing oneself, the [Plaintiff] has experienced a mild limitation. At psychiatric examinations by her primary care provider in 2020 and 2021, [Plaintiff] had intact insight and judgment, but she reported on one occasion that she sometimes cannot get out of bed due to depression and anxiety. At a mental status examination on October 18, 2021, claimant had depressed affect and mood but appeared well groomed and was fully oriented with fair insight and judgment. Considering some difficulty with depressed mood, claimant has a mild limitation in this area.

ECF No. 7-2 at 16-18.

Overall, the ALJ determined: (i) "[t]here [was] no evidence of a two-year history of medical treatment, mental health therapy, psychosocial supports(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the [Plaintiff's] mental disorder, and marginal adjustment, that is, minimal capacity to adapt to changes in the environment or to demands that are not already a part of the [Plaintiff]'s daily life" (ii) "there was little or no evidence that claimant's adaptation to the requirements of daily life is fragile[,]" (iii) "[t]here are no recent treatment records indicating that [Plaintiff]'s symptoms are exacerbated when changes occur or there is an increase in demands on her, or that she is unable to function outside of the home or a more restrictive setting without substantial psychosocial support," and (iv) "[t]here are no current episodes of a deterioration of functioning

as a result of additional demands or changes in the environment necessitating a significant change in medication or other treatment or hospitalization." *Id*. at 17-18.

Plaintiff contends that "it is unclear how the ALJ arrived at said mental RFC in the absence of any relevant medical opinions for guidance or an explanation otherwise creating a logical bridge between the crafted mental RFC and the evidence of record" and, "given the absence of mental opinions[,]"[10] remand for further proceedings is warranted so that the ALJ can "provide further explanation" and "possibly further development of the record." ECF No. 15-1 at 14-16. However, "[t]his misstates the ALJ's duty." *Malichek v. Comm'r of Soc. Sec. Admin*., No. 21-CV-00222 (JMA), 2023 WL 2403629, at *7 (E.D.N.Y. Mar. 8, 2023). As the Second Circuit has explained:

> where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.

*Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (internal citations omitted).

Here, the ALJ properly relied on Plaintiff's mental status examinations findings in determining Plaintiff's mental RFC, and, therefore, the ALJ "had no obligation to seek additional information prior to determining Plaintiff's RFC." *Malichek*, No. 21-CV-00222 (JMA), 2023 WL 2403629, at *7 (treating physicians' notes and records are sufficient to determine Plaintiff's

---

[10] Although Plaintiff identifies missing medical opinions and claimed that obtaining them would complete the medical evidence regarding her mental RFC, she failed to provide any means to obtain these opinions, making it unreasonable for the ALJ to acquire the information. *See e.g., Krystal R. v. Comm'r of Soc. Sec.*, No. 8:20-CV-0513 (ML), 2021 WL 3287776, at *6 (N.D.N.Y. Aug. 2, 2021) ("The ALJ's disability determination was based upon medical records totaling almost 1000 pages and included an opinion from Dr. Bonnabesse, along with physical and psychiatric consultative examinations. Based on Plaintiff's hearing testimony, the single missing note from Dr. Bonnabesse did not identify any significant deterioration in Plaintiff's condition or substantial changes in treatment approach that were not otherwise addressed in the record."); *see also Curley v. Comm'r of Soc. Sec. Admin.*, 808 F. App'x 41, 44 (2d Cir. 2020) (rejecting Plaintiff's argument that the ALJ did not obtain critical medical records, in part, because Plaintiff did not provide them to the district court or describe their contents).

RFC); *see also Pellam*, 508 F. App'x at 90 ("[E]ven if the ALJ did not credit all of [the consultative examiner's] findings, [the consultative examiner's] medical opinion largely supported the ALJ's assessment of [plaintiff's] residual functional capacity. Under these circumstances—especially considering that the ALJ also had all of the treatment notes from [plaintiff's] treating physicians—we do not think that the ALJ had any further obligation to supplement the record by acquiring a medical source statement from one of the treating physicians."). And, in any event, "[a] lack of supporting evidence on a matter for which the claimant bears the burden of proof," – here, Plaintiff's mental RFC – "particularly when coupled with other inconsistent record evidence, can constitute substantial evidence supporting a denial of benefits." *Bany v. Colvin,* 606 F. App'x 621,622 (2d Cir. 2015).

The ALJ otherwise diligently garnered all relevant information and evidence necessary for a fair adjudication of Plaintiff's claims and made a diligent effort to develop the administrative record by: (i) requesting medical records, (ii) arranging consultative examinations, and (iii) considering all the evidence presented by Plaintiff. During the hearing, the ALJ inquired about Plaintiff's healthcare providers, obtained the records from all the sources that she identified, and obtained medical expert testimony analyzing the complete medical records. *See e.g.*, *Umansky v. Apfel*, 7 F. App'x 124, 127 (2d Cir. 2001) (diligent effort is shown by contacting treating physicians to further explain their medical opinions); *Rivers v. Kijakaz*i, 2023 U.S. App. LEXIS 6002, *4 (2d Cir. 2023) (the duty to develop the record requires the ALJ to contact treating physicians for their medical opinion on the extent to which the claimant's injury impacted her ability to function); *Garcia v. Apfel*, 1999 U.S. Dist. LEXIS 17969, *19 (S.D.N.Y. Nov. 19, 1999) (holding the ALJ was required to request direct medical evidence from the treating and consultative sources about Plaintiff's ability to perform sedentary work); *Krystal R*,

2021 U.S. Dist. LEXIS 143586, *1 (finding the ALJ fulfilled his enhanced duty to develop the administrative record as mandated by 42 U.S.C.S. § 423(d)(5)(B) based on the ALJ's numerous oral and written queries to the plaintiff about her treatment history, along with several requests to the plaintiff's pain management specialist to enhance the record).

Accordingly, this Court finds that the "ALJ met his obligation to develop the administrative record, and there are no grounds for remand related to this issue." *Krystal R.*, No. 8:20-CV-0513 (ML), 2021 WL 3287776, at *6.

**B**.    ***The ALJ's RFC Assessment Was Supported by Substantial Evidence***

Pursuant to Social Security Ruling ("S.S.R.") 96-8p, an "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." *See* S.S.R. 96-8p, 1996 WL 374184, at *1 (July 2, 1996). "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *See id.* When conducting a function-by-function analysis for the RFC, the ALJ must assess the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch. *Walters v. Astrue*, 11-CV-640 (VEB), 2013 U.S. Dist. LEXIS 20550, at *10 (N.D.N.Y. Feb. 15, 2013) (citing 20 C.F.R. § 404.1513(c)(1); §§ 404.1569a(a), 416.969a(a)).[11] This assessment is considered to discern the individual's ability to perform work-related activities, taking into account the person's limitations or restrictions. *Salati v. Saul*, 415 F. Supp. 3d 433, 451 (S.D.N.Y. 2019). In doing so, the ALJ must cite to and include medical opinion authority in

---

[11] An ALJ is not required to perform a function-by-function analysis in *every circumstance*. So long as the ALJ provides "an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that an additional analysis would be unnecessary or superfluous." *Milliken v. Berryhill*, 1:16-CV-00297 EAW, 2017 U.S. Dist. LEXIS 118950, at *54 (W.D.N.Y. July 28, 2017) (citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)). "Remand may be appropriate, however, where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id*. at *54-55.

the decision.  *Morse v. Saul*, 19-CV-304-MJR, 2020 U.S. Dist. LEXIS 94494, at *11 (W.D.N.Y.

May 29, 2020).  Still, an ALJ must not put forth his own evaluations of the medical findings.  *Id*.

(erroneously giving limited weight to medical opinions and finding overwhelming support in

non-opinion mental health evidence).

An ALJ is "required to consider all of the medical opinion evidence in the record."  *Hahn*

*v. Saul*, 20-CV-06124 (KAM), 2023 U.S. Dist. LEXIS 135215, at *11 (E.D.N.Y. Aug. 3, 2023)

("*Hahn*") (citing § 404.1520(b)(c)) ("We will articulate in our determination or decision how

persuasive we find all of the medical opinions and all of the prior administrative medical

findings in your case record.")).  In *Hahn*, the Court stated that the ALJ's failure to discuss and

consider a doctor's assessment was grounds for remand.  *Id*. at *11-12.  Although the ALJ must

consider all medical evidence in the record, the new regulations state that an ALJ must not defer

or give any specific weight to a medical opinion or finding.  *Ronald D. v. Comm'r of Soc. Sec*.,

No. 2:20-cv-00197, 2021 U.S. Dist. LEXIS 247735, at *10 (D. Vt. Dec. 29, 2021).

In *Rushford*, Plaintiff appealed the district court's judgment upholding denial of his

application for benefits.  *Rushford v. Kijakazi*, No. 23-317, 2023 U.S. App. LEXIS 34401 (2d

Cir. Dec. 28, 2023).  The Court affirmed the district court's ruling on four grounds.  *First*, the

Circuit found that the ALJ properly credited certain medical reports over others and explained

why those opinions were supported by the record and consistent with other evidence.  In

considering these opinions, he determined that Rushford was not disabled.  *Id.* at *2-3.  *Second*,

the ALJ was correct in concluding that he was not per se disabled upon considering 20 C.F.R. pt.

404, subpt. P, app. 1, §§ 12.04, 12.06-12.07, 12.15.2.  *Id*. at *4.  *Third*, the *Rushford* court found

that the ALJ looked to Rushford's limitations and then discussed whether the intensity,

persistence, and limiting effects of his symptoms would limit his work-related activities.  *Id*. at

*5. Upon this discussion, the ALJ concluded that Rushford could still engage in certain work. *Id*. at *6. *Fourth* and *finally*, the court also found that the ALJ properly considered the full scope of all Rushford's reported symptoms and appropriately discredited Rushford's subjective testimony in light of other evidence in the record. *Id*. at *6-7.

As mentioned, the ALJ found that Plaintiff retained the RFC to perform a range of sedentary work[12] with the following restrictions: only occasional balancing, stooping, crouching, kneeling, crawling, or climbing of stairs or ramps; no climbing of ladders, ropes, or scaffolds; no exposure to unprotected eights, dangerous machinery, or concentrated exposure to cold temperature extremes or vibrations; and only simple tasks. *See* ECF No. 7-2 at 18. The Court finds that here, like in *Rushford,* the ALJ appropriately considered all evidence before him spanning from medical records to Plaintiff's testimony.

In sum, the ALJ's decision concerning the medical experts are supported by substantial evidence and free of legal error. Nor did he substitute a physician's opinion for his own. Rather, the denoted which physician's reports were particularly persuasive over others when compared to Plaintiff's own testimony and other physicians' reports. *C.f. Balotti v. Comm'r of Soc. Sec*., 605 F. Supp. 3d 610 (S.D.N.Y. 2022) (granting the plaintiff's motion and remanded the case for further proceedings, where the ALJ: (i) failed to assess the supportability component of the new regulations since he omitted the source of the doctors' opinions; (ii) erred in relying upon clinical and objective findings and did not explain how they were inconsistent with the doctor's opinion; (iii) improperly drew medical conclusions herself; (iv) cherry picked portions of the physician's

---

[12] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *See* 20 C.F.R. § 404.1567(a).

record, especially since there were other portions discussing the severity of plaintiff's condition; and (v) failed to separately consider the supportability and consistency factors).

Specifically, in finding that Plaintiff was still capable of a reduced range of sedentary work, the ALJ did not reject Plaintiff's allegations entirely,[13] but rather assessed significant RFC restrictions. *See* ECF No. 7-2 at 18. The ALJ acknowledged that Plaintiff could no longer perform her past work that required her to be on her feet most of the day, and considered that, while Plaintiff sustained an ankle fracture in September 2019 when she slipped on water on a cruise ship and she subsequently underwent surgery, subsequent objective medical evidence confirmed routine healing and intact hardware. *See* ECF No. 15-4 at 12-13 (emphasis added) ("[W]hile Plaintiffs residual standing and walking limitations would preclude walking and standing as required for light work or Plaintiff's past work, [the ALJ found] she *was* capable of sufficient walking and standing to perform the requirements of some sedentary work that involves mostly sitting"); *see also* 20 C.F.R. §§ 404.1567(a), 416.967(a) (explaining a sedentary job as one which primarily involves sitting); *Dumas v. Schweiker*, 712 F.2d 1545, 1551 (2d Cir. 1983) (finding the conditions which plaintiff suffered were not "in themselves disabling" where he admittedly could "perform the minimal motor functions necessary for sedentary work" – *i.e.*,

---

[13] The Court additionally finds the ALJ considered that many of Plaintiff's own statements and allegations for purposes of her disability claim "were congruent with the ability to perform some sedentary work." ECF No. 15-4 at 15. Specifically, the ALJ considered: (i) Plaintiff's reported improvement in her symptoms post-ankle fracture in 2019, (ii) Plaintiff's reports of no acute distress or no focal neurological defects, (iii) Plaintiff's lack of reporting of "debilitating pain[,]" (iv) Plaintiff's testimony that she was capable of standing for 1.5 hours and walking for 40 minutes, and (v) Plaintiff's reports of but little difficulty in walking two blocks or a mile or standing as long as an hour, and no difficulty in walking between rooms or performing light or even heavy home activities. *Id*. at 15-16; *see also Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) (quoting *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)) (holding "the ALJ's finding that [plaintiff] could perform light work was supported by substantial evidence, including plaintiff's] own testimony" and further noting "the ALJ 'is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'"); *Johnson v. Colvin*, 669 F. App'x 44, 46 (2d Cir. 2016) ("In concluding that [plaintiff] could 'perform light work,' the ALJ relied on a variety of evidence" including plaintiff's own testimony post-surgery).

he could "sit, walk and stand, even if for only a limited span of time before the pain sets in, and he can apparently lift up to ten pounds" and further noting "disability requires more than mere inability to work without pain … [t]o be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment").

The ALJ's opinion was further supported by the opinions of consultative examiner Dr. Pollack and State agency medical consultant Dr. Ceaser, who assessed Plaintiff with "only a moderate limitation in walking" and that, "within 12 months of her ankle injury, Plaintiff would be capable of performing functions commensurate with some sedentary work." *See* ECF No. 15-4 at 14. *See e.g., Cook v. Comm'r of Soc. Sec.,* 818 F. App'x 108, 109 (2d Cir. 2020) (finding the ALJ's conclusion that plaintiff could perform sedentary work was supported by substantial evidence where physician reports: indicated plaintiff did not have any limitations on her ability to stand or walk and reach overhead, found a moderate limitation for kneeling and squatting, and that plaintiff could perform simple tasks independently and relate adequately with others); *see also Pellam v. Astrue,* 508 F. App'x 87, 89 (2d Cir. 2013) (finding consultative examiner's opinion largely supported the ALJ's assessment of plaintiff's residual functional capacity); *Snyder v. Saul*, 840 F. App'x 641, 643 (2d Cir. 2021) (holding the ALJ properly weighed the medical evidence with respect to plaintiff's physical impairments where he discussed the opinions of Dr. S. Putcha, Dr. Nader Wassef, Dr. Louis A. Fuchs, and Dr. Lai Kuang and found that each described plaintiff's limitation as moderate).

Plaintiff's contention that the ALJ was compelled to assess greater RFC restrictions based on the form opinion from Dr. Salomon is unavailing. The Court finds the ALJ properly evaluated Dr. Salomon's form responses, "compared them to the overall record evidence, and explained why" the responses "were an extreme portrayal of Plaintiff's limitations." ECF No. 15-4 at 17.

Specifically, the ALJ found Dr. Salomon's opinion that Plaintiff "can sit for 2 hours and

stand/walk for 1 hour during an eight-hour workday; can occasionally lift/carry 10 pounds;

would need to recline or lie down during the day for more than the typical breaks in a workday

and would require unscheduled 15-minute breaks every hour; has no limitations for reaching,

handling, or fingering; would be absent more than four times per month; and her symptoms

would constantly interfere with her attention and concentration" persuasive as to lifting/carrying

and the use of her hands, but that the record "[did] not support such *extreme limitations* for

sitting and standing or the need for 15 minute breaks every hour, or the need to lie down or

recline, or for absences four or more times a month[;]"

> The treatment records of claimant's orthopedist and physical therapists, imaging that shows a healed fracture, and documentation of improvement and reduced pain with better ambulation beginning in January 2020 do not support such a degree of limitation. Nor is there an explanation from Dr. Salomon to support such a degree of limitations.
>
> Although [Plaintiff] has some issues focusing, constant interference with attention and concentration is also not supported. [Dr. Salomon's] opinion is somewhat consistent with Dr. Bitterman's opinion, but is not entirely consistent with the other opinions below.

ECF No. 7-2 at 23 (emphasis added); *see also* ECF No. 15-4 at 18-19 ("As the ALJ considered,

the evidence showed routine healing of Plaintiffs fracture, which belied such extreme limitations

as Dr. Salomon checked in his form responses. Similarly, Dr. Salomon's extreme responses were

incongruent with Plaintiffs own statements as to improvement in her symptoms and her

admissions regarding her ability to stand, walk, and perform activities.").

Indeed, there is no requirement that the agency accept the opinion of Dr. Salomon

regarding Plaintiff's limitations, and substantial evidence otherwise supported the ALJ's decision

not to adopt many of Dr. Salomon's conclusions. *See e.g.*, *Pellam*, 508 F. App'x at 89–90;

*Berrechid v. Comm 'r of Soc. Sec.,* No. 20-CV-5342 (BMC), 2021 WL 5013657, at *4 (E.D.N.Y.

Oct. 28, 2021) (In a "post-treating physician rule case, the ALJ only needs to consider the totality of the evidence, and need not give particular deference to a treating doctor's medical opinion."); *Cichocki v. Astrue*, 729 F.3d 172, 178 (2d Cir. 2013) ("Based on a thorough examination of the evidence of Cichocki's relevant limitations and restrictions, the ALJ concluded that Cichocki's impairments did not preclude her from light work, subject to specified modifications."); *Bruce H. v. Comm'r of Soc. Sec.,* 1:21-CV-00596-LJV, 2024 U.S. Dist. LEXIS 72973, at *5 (W.D.N.Y. Apr. 22, 2024) ("As long as the ALJ considers all the medical evidence and appropriately analyzes the medical opinions, an RFC consistent with the record is not error."); *Schillo v. Kijakazi*, 31 F.4th 64, 77 (2d Cir. 2022) ("An ALJ may, however, discount a treating physician's opinion—regardless of its form—if it is not supported by substantial evidence in the record.").

Accordingly, remand is not warranted here, since the ALJ's opinion was based on his review of objective medical evidence before him which led to the conclusion that Plaintiff was ineligible for social security benefits. *See Bruce H. v. Comm'r of Soc. Sec.,* 1:21-CV-00596-LJV, 2024 U.S. Dist. LEXIS 72973, at *5 (W.D.N.Y. Apr. 22, 2024) ("As long as the ALJ considers all the medical evidence and appropriately analyzes the medical opinions, an RFC consistent with the record is not error."); *cf. Warcholak v. Colvin*, No. 1:16-cv-00129(MAT), 2017 U.S. Dist. LEXIS 20806, at *13 (W.D.N.Y. Feb. 14, 2017) (remanding the matter where "the ALJ and the Appeals Council misapplied the relevant legal standards, and failed to properly develop the record by obtaining a function-by-function assessment from a medical expert").

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff's Motion for Judgment on the Pleadings (ECF No.

15) is **DENIED**, and Defendant's Cross-Motion to Remand (ECF No.15-2) is **GRANTED**. The

ALJ's Decision is therefore **AFFIRMED**, consistent with this Order.  The Clerk of the Court is

directed to close out this case.


Dated:        Central Islip, New York
              March 12, 2025                            **S O    O R D E R E D:**

                                                       /S/ *James M. Wicks*

                                                       JAMES M. WICKS
                                                   United States Magistrate Judge

41